THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DARRELL L. WATSON, Defendant-Appellant.

Third District    No. 81-154

Opinion filed March 24, 1982.—Modified on denial of rehearing August 16, 1982.

Robert Agostinelli and Stephen Omolecki, both of State Appellate Defender's Office, of Ottawa, for appellant.

Warren T. McNeill, State's Attorney, of Monmouth (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Defendant Darrell Watson was tried before a jury, convicted of indecent liberties with a child, and sentenced to 15 years' imprisonment.

According to the evidence presented at trial, defendant's wife left the family home about 6 p.m. on November 4, 1979, to run an errand, leaving defendant with the couple's two children, three-year-old Margaret and one-year-old Darrell Raymond. Defendant was preparing to take a shower, and the two children were in their bedroom—the baby in his crib and the little girl playing with some toys on the floor. Margaret was wearing the play clothes she had had on all day—pants and a T-shirt. When the mother returned about one-half hour later, defendant was in his bedroom watching television, and he said that both children had been put to bed because they were ornery, even though it was two hours before their usual bedtime. He also said that while he was taking a bath, he had heard a loud crash, that he called to Margaret, and that she came to the bathroom door with blood on her face, chest and legs. He cleaned her up but could not tell where the blood was coming from. He stated that he changed her clothing and put her dirty clothes in the washing machine.

Although defendant told her not to go see Margaret for fear of waking her, the mother did check on Margaret and found her sleeping. She was covered with a blanket and there was no trace of blood on her face or arms. Defendant told the mother that he supposed Margaret must have been trying to climb into the crib and fallen onto the rocking chair which was next to the crib. A short time later Margaret awoke, and the mother discovered that the little girl was bleeding between her legs. She cleaned her with a washcloth, put on clean underpanties, and over defendant's objection, the mother took Margaret to Monmouth Memorial

Hospital emergency room. She told emergency room personnel that the little girl had been injured while at home with defendant, and that defendant thought she must have fallen.

The Watson's family doctor, Dr. Lindo, was summoned, and his examination indicated a laceration in the vaginal area, extending from the exterior into the interior of the vagina. He was able to insert his index finger into the vaginal canal where he detected additional lacerations. He consulted with a gynecologist, Dr. Limanon, who also examined Margaret. It was decided to admit Margaret to the hospital and to do a complete examination under anesthetic the next morning.

The mother called defendant and her mother and grandmother to come to the hospital as soon as the doctors decided to hospitalize Margaret overnight. When defendant arrived, the examining physician told him that he believed Margaret had been sexually abused.

During the examination the next morning, it was confirmed that Margaret had suffered two additional interior lacerations of the vaginal wall. All three lacerations required sutures. Both doctors testified at trial that the lacerations were indicative of penile penetration and that a fall onto the rocking chair was not a likely cause of the injuries because there were no bruises in either the exterior or interior region.

Photographic exhibits in the record reveal that the rocker in question was a sturdy, wooden, child's rocker with a nonpointed rounded knob, appearing to be more than an inch in diameter, extending upward no more than two inches at either corner of the back of the chair. When the mother returned home the night of the incident, the chair was located near the baby crib in the bedroom shared by the children. There was testimony that in the past Margaret had used the chair in order to climb into the baby's bed and that the chair was usually kept on the other side of the room. The State called as witnesses two nurses who had attended Margaret in the emergency room. They both testified that Margaret had told them that she did not fall on the rocking chair.

On November 5, the morning of the surgery, a police officer, Lieutenant Roy Johnson visited the Watson home to investigate the possible child-abuse charge. He and the defendant's wife went through all the items in the washing machine where she had placed the soiled clothing when she cleaned Margaret before going to the hospital. They found two pairs of bloodstained panties and three soiled washcloths.

On the morning of surgery, the father came to the hospital for awhile, but then he left and went to the home of his foster mother. She testified that he was so upset and depressed that she called two different hospitals, finally making arrangements for him to be admitted to a hospital in Burlington, Iowa. According to defendant's wife, the night before defendant had commented that if he went to Burlington, "they couldn't

touch me," but she had advised him that it would look like he was guilty if he left. Defendant also commented to some neighbors that he might as well leave since they already had him convicted.

Defendant called several witnesses who told how upset he was on the morning of November 5. He took the stand in his own defense and described how he thought Margaret must have injured herself by falling onto the rocking chair. Defendant identified the underpants he took off Margaret when he cleaned the blood off her. He stated that he cleaned blood off the rocking chair before the mother came home. He denied ever mentioning leaving the State of Illinois to avoid the authorities.

Defendant was charged with aggravated incest, indecent liberties with a child, and aggravated battery. The jury found him guilty on all three charges, and the State elected to have judgment of conviction entered on the indecent liberties verdict. Following a sentencing hearing, the trial court entered the maximum sentence of 15 years' imprisonment. Defendant has appealed from his conviction and sentence. We affirm.

Defendant first contends that he was not proved guilty beyond a reasonable doubt in view of the fact that all of the evidence against him was circumstantial and considering that sexual offenses require a stricter standard of proof than do other types of crimes. Defendant discusses the credibility of witnesses and the weight that should be given the evidence, and concludes that the State failed to meet its burden. We do not agree. Clearly only the defendant had an opportunity to commit the act charged, and the medical evidence indicated not only that sexual abuse was the probable cause of injury but also that a fall onto the rocking chair was an unlikely cause. There was additional corroborative evidence for the State's theory, such as that only two bloodstained panties were found, that it can be inferred that defendant attempted to flee to Iowa to avoid Illinois authorities, and that he was reluctant to have Margaret taken to the hospital. The only explanation offered by defendant for a cause of the injuries was a fall. After viewing photographs of the rocking chair, we believe it inherently incredible to suggest that a three-year-old child could suffer lacerations to the interior of the vaginal canal without incurring any bruises as a result of a fall upon the chair while she was wearing pants—the play clothes she had worn all day. We conclude that the evidence was sufficient to support a finding of defendant's guilt.

■▌ Defendant has assigned as error 13 rulings by the trial court sustaining objections by the State to questions asked by defense counsel during cross-examination, five rulings sustaining objections to questions asked by defense counsel during defendant's case-in-chief, and three comments made by the State during closing arguments. Defendant also contends that he was denied a fair trial by the combined effect of the prosecutor's misconduct and the trial court's acquiescence in that conduct. None of

these alleged errors were specifically included in defendant's post-trial motion; hence, all were waived. Because defendant claims the cumulative effect of the allegedly erroneous rulings was to deny him a fair trial, we have nonetheless considered the merits of defendant's arguments and have concluded that most of the rulings were not erroneous, and that defendant was not denied a fair trial. It would serve no useful purpose to discuss each ruling separately and would unduly lengthen this opinion.

Defendant also contends that the trial court erred in allowing the two emergency room nurses to testify to statements made by Margaret, the three-year-old victim. According to the record, one of the nurses asked Margaret who washed the rocking chair, and the little girl answered, "Nobody." The nurse then asked, "Wasn't there blood on the rocking chair?" and Margaret said, "No." The nurse then asked where the blood was, and Margaret did not answer. The other nurse then asked if it was a secret, and when Margaret said yes, the nurse asked, "Why don't you tell me." Margaret answered, "I didn't fall on the rocking chair." The trial court permitted the nurses to testify to Margaret's statements on the ground that they were spontaneous declarations and thus came within an exception to the rule against hearsay.

■■ As a general rule, a statement will qualify as a spontaneous declaration (1) if the occurrence was sufficiently startling so as to produce a spontaneous and unreflecting statement, (2) if there was an absence of time to fabricate, and (3) if the statement related to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Robertson* (1976), 43 Ill. App. 3d 143, 356 N.E.2d 1180.) Defendant argues that Margaret's statements did not qualify as spontaneous because she was answering questions, because she had approximately two hours to reflect and fabricate, because she had a reason to fabricate in that she had been told not to climb on the rocking chair, and because she was not excited but placid.

We note, first, that these were the first words which Margaret spoke after her mother discovered her injury, and also that she had been out of the presence of defendant only for the short time it took to drive to the hospital. The mother had testified to Margaret's withdrawn manner, and apparently the little girl was in bed asleep for nearly one hour before the injury was discovered. Thus there was actually very little time for fabrication. Certainly the event was sufficiently startling to produce a spontaneous statement, and clearly the statements did relate to the circumstances of the occurrence. We also note that the credibility of a child of such tender years would be a matter for the jury to weigh. We are not prepared to say that the trial court erred in this case. We believe that the admissibility of the statements of an abused child of tender years is a matter for the discretion of the trial court who is in the better position to

weigh the probative value of the evidence against the possible prejudice to defendant. To have left the impression that Margaret never said anything about the incident would give the jury cause for speculation which might be more harmful to defendant than the nurses' testimony. We cannot say that the trial court abused its discretion in this case. *Cf. People v. Gross* (1979), 75 Ill. App. 3d 311, 393 N.E.2d 1308.

■■ Defendant further contends that it was error to permit a police officer to testify that he met defendant in a hospital psychiatric ward in Iowa two days after the incident, and that such testimony was irrelevant and would give rise to "wild speculation." Defendant did not object on that ground at trial or in his post-trial motion, but rather objected only on the ground that it would be prejudicial to inform the jury that the conversation occurred in Burlington, Iowa. Therefore, defendant waived any error that may have occurred. Furthermore, the testimony was relevant to show that defendant did in fact leave the State of Illinois within a short time after the offense.

■■■ Another error assigned by defendant was the fact that the trial court permitted the bloodstained clothing to be taken into the jury room during deliberations. Generally a trial judge may permit jurors to take with them those tangible objects which have been duly admitted into evidence, if they are relevant to any material issues, and the court has considerable discretion in deciding what exhibits may be sent to the jury room. (*People v. Dixon* (1978), 58 Ill. App. 3d 557, 374 N.E.2d 900.) In this case we believe the items of clothing were relevant to the issues of fact confronting the jury. Defendant claimed that his daughter was wearing clothes, including underpants, when she fell, while the State theorized that she was unclothed when she was sexually abused. Under defendant's theory, there should have been three sets of underpants in the washing machine, while the State's theory would have been compatible with the two pairs that were found. Both the number and condition of the panties were relevant to the jury's deliberation. We conclude the trial court did not err.

Finally, defendant contends that the 15-year sentence was grossly excessive, that the trial court did not consider all possible mitigating factors, and that the trial court should not have taken into account his lack of remorse. We note the evidence presented at the sentencing hearing included that the victim has suffered emotionally as well as physically.

In imposing sentence, the trial court observed that defendant had been convicted of a particularly offensive crime but rejected the prosecutor's suggestion that defendant be sentenced to an extended term of imprisonment. The court found that probation would not be appropriate, that imprisonment was required for the protection of at least one member of the public, presumably the victim, that probation would tend to deprecate the seriousness of the offense and would not be consistent with

the ends of justice, that defendant inflicted bodily injury to another person, that a sentence of imprisonment was necessary for deterrence, that the victim was of a tender age, that defendant had abused his parental relationship with the victim, and that defendant had shown no remorse. In mitigation, the court observed that defendant did not have a significant history of prior criminal activity and had led a substantially law-abiding life prior to the commission of the instant offense. The presentence investigation report reveals that the 27-year-old defendant's only prior criminal record consisted of six different traffic convictions between 1973 and 1980.

The standard of review when considering the sentence a trial court has imposed is whether the trial court has abused its discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) When a reviewing court is asked to exercise its power to reduce a sentence, that power will be exercised cautiously and the court will not reduce the sentence merely as an exercise of judicial clemency. *People v. York* (1980), 87 Ill. App. 3d 1026, 1033, 409 N.E.2d 525, 530.

Although rehabilitation, together with the seriousness of the offense, is a factor which the Illinois Constitution requires a sentencing judge to consider (Ill. Const. 1970, art. I, §11), rehabilitation is not the sole factor (*People v. West* (1977), 54 Ill. App. 3d 903, 909, 370 N.E.2d 265, 270, and does not outweigh the other factors (*People v. Henderson* (1980), 83 Ill. App. 3d 854, 870, 404 N.E.2d 392, 404). Also, this court has previously recognized that a defendant's lack of remorse is an appropriate factor to consider.

■■ In our view, the trial court properly took into account that the nature of this crime was particularly offensive and heinous. We do not believe the trial court abused its discretion in this case.

For the reasons stated, we affirm the conviction and sentence.

Affirmed.

ALLOY and HEIPLE, JJ., concur.